S/I                                          FEE PAID

William Moran II (*Pro Hac Vice* forthcoming)
  Bill@awlegalfirm.com
ARTHUR WILLIAM, LLP
10015 Old Columbia Rd.
Columbia, MD 21046
Tel: 520-604-0260

Scott M. Malzahn (Bar No. 229204)
  smalzahn@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

*Attorneys for Plaintiff Michael Gruen*

```
            FILED
   CLERK, U.S. DISTRICT COURT

        3/5/24

CENTRAL DISTRICT OF CALIFORNIA
BY: ____eee____ DEPUTY
```

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL GRUEN,<br><br>       Plaintiff,<br><br>v.<br><br>JOSHUA RICHARDS, an individual; CHRISTOPHER SAWTELLE, an individual; CROSSCHECK STUDIOS, LLC, a California Limited Liability Company; BUDDY'S HARD, LLC, a Delaware Limited Liability Company and DOES 1 through 100, Inclusive,<br><br>       Defendants. | Case No. 2:24-CV-01777-CBM-SSCx<br><br>**COMPLAINT FOR:**<br><br>**1. RESCISSION: FRAUD**<br>**2. RESCISSION: DURESS**<br>**3. RESCISSION: UNDUE INFLUENCE**<br>**4. RESCISSION: FAILED CONSIDERATION**<br>**5. RESCISSION: PUBLIC POLICY**<br>**6. BREACH OF CONTRACT**<br>**7. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**8. FAILURE TO PAY WAGE/SALARY**<br><br>**[[DEMAND FOR JURY TRIAL]** |

## **INTRODUCTION**

1.     At age 21, Michael Gruen co-founded and became V.P. of Talent at TalentX where he almost single-handedly recruited 100 of the top social media influencers. This included Josh Richards, an internet wunderkind just shy of his 18th birthday, who signed with TalentX with parental consent in accordance with California Family Code section 6750, *et. seq*. A month later, as a TalentX V.P., Gruen helped create the internet phenomenon, the Sway House, a full-time content creation mansion that was a crossover of the '90s boy band, The Real World house, and Tik Tok dances. Weeks later, Gruen chose Richards to headline the Sway House and within months demanded that Richards's contract be reworked on most favored terms. Gruen insisted that Richards receive equity in TalentX – it was unheard of for a young artist to be part-owner of their management company. Gruen signed over half of his equity to make it happen. Gruen never took a commission.

2.     As Richards and the Sway House took over the internet, Gruen worked the phones to help them cash in. The industry took note of the 21-year old powerbroker. One Forbes article titled "Michael Gruen Knows Everybody," explained: "If you need tickets to a Rockets basketball game, he can call Tilman Fertitta. If you're looking to start a streaming business, he'll connect you with cofounder of Netflix Marc Randolph, Dallas Mavericks owner Mark Cuban, cofounder of Twitch Justin Kan, and former CEO of TikTok Kevin Mayer . . . **He's got that kind of juice**."

3.     After the Sway House broke up in February 2021, Gruen and Richards turned their focus to the twin goals of making Richards the first billionaire online influencer and helping Richards's transition into the film industry. In furtherance of these goals, Gruen would co-found several businesses with Richards including CrossCheck Studios, a production company, and CrossCheck Sports, a sports agency.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*The Rise of CrossCheck Studios*

4.      CrossCheck Studios was founded on February 17, 2021. Six days into its existence, Gruen struck a groundbreaking partnership with Unrealistic Ideas led by Mark Wahlberg, Steven Levinson and Archie Gips. Gruen initiated another strategic partnership with Influential, a major online marketing player. Soon after, Gruen cemented CrossCheck as a Hollywood production company striking a First-Look film deal with STXfilms.[1] The deal provided for CrossCheck to produce its first movie, Halloween Party, and for Richards to headline it. The deal made Richards the youngest studio-backed producer in Hollywood despite no prior experience. WME and CAA even initiated coverage. Finally, Gruen initiated a TV production deal with Amazon, worth over $5 million.

*The Conspiracy to Destroy Michael Gruen*

5.      In April 2021, ICM talent agency's Chris Sawtelle begged for four hours for Richards to leave Gersh, his talent agency, and to sign with him at ICM. Gruen knew Sawtelle from when his ICM team had partnered with TalentX 18 months earlier. Months in, TalentX chose not to continue with ICM, citing Sawtelle's: (a) failure to bring business; (b) falsely taking credit for others' deals; (c) claiming he was a TalentX V.P.'s superior; and (d) dropping the ball on deals. Ex. A, 5/20/20 Letter.

6.      Despite the history, Richards left Gersh and signed with Sawtelle as his agent. Then, in September 2021, Sawtelle became Co-President at CrossCheck. In talks for the job, Sawtelle said he was "coming for the Rolodex," referring to Gruen's contacts. Gruen later learned that Sawtelle harbored malice from his prior failure.

---

[1] No deal listed in this Complaint would have worked without the amazing staff – it takes a team. Further, Richards' talent agent at Gersh, and then ICM, were involved in each deal. That said, Gruen was instrumental to each deal listed herein.

7.      On November 7, 2021, Gruen underwent bariatric surgery. Gruen returned to remote work that same day while in tears from post-surgical pain. Gruen kept working long weeks,[2] for CrossCheck and for Buddy's Hard (Richards's wholly owned LLC), until late-January 2022. As Gruen explained in a January 2022 video: "Every day I work my a-- off to make sure the people around me are succeeding."

8.      On February 2, 2022, Gruen fell down the stairs and, on insistence of his father and recommendation of his doctor, went home to New York. The next day, Gruen collapsed on the street and was rushed to the E.R. He learned that he was suffering Beriberi, a condition that, if left untreated, can result in cardiovascular failure or permanent paralysis. The condition causes neurological defects including speech and ambulation difficulties, mental confusion, and loss of feeling, with a 3-6 month recovery period for the brain and nervous system effects. At the time, Gruen was also struggling with Bipolar II, of which CrossCheck and Richards were well aware.

9.      In March 2022, the Unrealistic Ideas team tipped off Gruen that a coup was underway against him. Despite being far from medically and mentally recovered, Gruen called Richards to say he was flying out to return to work. On the call, Richards told Gruen that he was being replaced by Sawtelle, Co-President of CrossCheck at the time, and that Gruen should not return.

10.     Gruen would later learn the reason why – Sawtelle had spread malicious claims to Richards and industry-wide that Gruen had "misappropriated" or "siphoned" money from Richards and that he was a "fraud." In reality, Gruen netted negative income and was the only unpaid employee or executive.

---

[2] Post-surgery, his weekly workload reduced from about 110 hours per week to less than 80 hours per week, and further, the week prior to his February 2022 medical leave, his hours worked count did decrease substantially due to marked illness.

*The Kafka-esque Coup Before the Settlement*

11.     During Gruen's medical leave, Sawtelle removed CrossCheck's esteemed business manager and replaced him with his personal tax preparer, whose only professional credential was as a "Certified Tax Preparer" ("Business Manager").

12.     When Gruen requested an equity buy-out (as suggested by Richards weeks earlier) and his form K-1, CrossCheck – after first ignoring Gruen – referred him to the Business Manager. In response to Gruen, the Business Manager claimed in emails, with Richards and investors copied, that Gruen was trying to "line his own pockets" by "unilaterally siphoning off money from the business" and by improperly taking a claim to investor funds.

13.     In his emails, the Business Manager mocked Gruen's medical absence for "fat-loss surgery" and claimed that Gruen was not entitled to income because he was gone for six months (Gruen was out for a few weeks).[3] The Business Manager also unilaterally declared Gruen's equity in CrossCheck Sports void ("no equitable internet [sic]") and disposed of the entity's assets without securing Gruen's consent.[4] While voiding Gruen's CrossCheck Sports equity, the Business Manager called the business Gruen's "ill-conceived failed venture" – that business was Richards's idea.[5]

---

[3] In a June 9, 2021 email, that was included in the thread of a Dec. 17, 2023 email on an unrelated matter of CrossCheck trying to figure out how to access their website account, Richards'/CrossCheck's attorney confirmed that the Business Manager's acts were "on behalf of Mr. Richards and the company."

[4] The Business Manager killed off CrossCheck Sports at the tail end of its first recruiting season, when players decide who to sign with, likely causing the investors' loss.

[5] As he explained here: https://youtu.be/9gmXUjChEII?si=KmR0JrWgTYECpI_C

14.     Gruen requested an accounting and to inspect records, but the Business Manager declined. Right after this, an attorney reached out to Gruen stating he was "litigation counsel to Mr. Joshua Richards" ("Litigation Counsel").[6] In his letter to Gruen, the Litigation Counsel claimed that Gruen had "abus[ed] his role" and put Richards into "self-serving deals" and "lopsided contracts" to "take advantage" of him. Gruen, who was extremely ill, was shaken by these false allegations. In reality, Gruen had worked 80+ hour weeks for a year in order to the benefit of all named Defendants only to receive net negative compensation. *See e.g.*, Ex. B.

15.     The pressure tactics designed to drive Gruen out of the business and deprive him of his equity continued, with the Litigation Counsel also claiming Gruen owed Richards $142,500 in back rent (something never previously claimed by Richards) for the privilege of falling asleep and waking up at the business where he was expected to be at all times working those unpaid hours. Litigation Counsel and the Business Manager proceeded to banish Gruen from the house, without any notice, prohibiting him from even picking up his belongings and threatening him with arrest for alleged harassment. The belongings that Gruen was not allowed to pick up included highly valuable memorabilia such as Suits TV show character Harvey Specter's desk and chair, potentially worth hundreds of thousands of dollars to fans of the show.

16.     Litigation Counsel and the Business Manager took these actions with knowledge, complete with letters from Gruen's doctor and psychiatrist, that Gruen's medical condition was a disability under California law and that he also suffered from Bipolar II. Behind the scenes, Sawtelle orchestrated the campaign to terrorize Gruen, in the name of Richards and CrossCheck, bragging to staff that Gruen was "taken care

---

[6] Litigation Counsel later identified himself as representing CrossCheck.

of," boasting about plans to publicize that Gruen would walk around the house (where he lived) in a t-shirt and boxers, and asking staff for "dirt" on Gruen.

*The Settlement*

17.     Two months after Gruen requested an accounting and inspection, the Litigation Counsel provided Gruen – who was still ill – a 20-hour exploding offer: $90,000 and dinner with Richards in return for his equity stake. Ex. C. Gruen accepted this due to duress, undue influence, fraud, and misrepresentation. First, the Litigation Counsel claimed in writing that Amazon refused to deal with CrossCheck, a material misrepresentation of fact worth over $5 million. Second, statements about the company's financials were false or deceptive because Richards had been dumping personal business costs onto CrossCheck's books.[7] Finally, defendants and their agents had spent the two months leading up to the settlement terrorizing the 23-year-old Gruen knowing he was suffering both medical and mental illness by: (i) kicking him out of his home; (ii) depriving him of his belongings; (iii) threatening him with arrest; (iv) defaming him as a thief and a fraud to investors and to Richards; (v) refusing to give him an accounting of his own business; and (vi) voiding his equity in another business (CrossCheck Sports). Defendants would then proceed to repeatedly breach the already unfair agreement.

18.     In sum, by fraud, misrepresentation, duress, and undue influence, CrossCheck procured a settlement agreement with Gruen that made a mockery of his rights as an equity holder. Moreover, the agreement never mentioned any wages for the thousands of hours that Gruen put into the business (and into Buddy's Hard),

---

[7] Buddy's Hard is Richards' sole-owned LLC, where his profits for social media work went. However, the employees on CrossCheck's books had to work primarily on deals to profit Buddy's Hard. In fact, Richards even shifted his existing Buddy's Hard staff onto CrossCheck's books. The effect of Richards's financial comingling was that he kept the profits while the losses were shared.

conferring an enormous benefit on the defendants without just compensation.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists and the amount in controversy of $38,974,960 plus punitive damages for fraud, well exceeds $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over Defendants Sawtelle and Richards who reside and work in California. The Court has personal jurisdiction over CrossCheck Studios, LLC, which is incorporated and headquartered in California, and over Buddy's Hard, LLC, which is headquartered and principally operates in California.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events that give rise to Plaintiff's claims transpired in the County of Los Angeles in the State of California and all Defendants reside, work, or principally operate in the County of Los Angeles in the State of California.

## PARTIES

22.     Plaintiff MICHAEL GRUEN ("Gruen") is a 25-year-old entrepreneur and businessman residing in Florida. Gruen was featured in Forbes's 30 Under 30 list for his substantial contributions to the media and entertainment industries as a guiding force behind the internet phenomenon, the Sway House, and his work on behalf of and in relation to Josh Richards. Business Insider profiled Gruen as one of the top 19 talent managers or agents for TikTok influencers[8] and then as one of the 24 power

---

[8] Dan Whateley, "*The top 19 talent managers and agents for TikTok influencers who are helping build the careers of a new generation of digital stars*," BUSINESS INSIDER (Apr. 14, 2020), https://www.businessinsider.com/top-talent-agents-and-managers-for-tiktok-influencers-creators-list-2020-4.

players using TikTok to transform the music industry.[9] Gruen and Richards co-founded CrossCheck Studios on February 17, 2021. Gruen's entire family relies on him now that his father is suffering from cancer, but due to the malicious and still ongoing acts of Defendants, Gruen has been deprived of a fair exchange for his valuable equity, compensation for one year of work, and has had his professional career amputated by Defendants obtaining, and going line-by-line through, his personal business contacts to falsely disparage him to each.

23.    Defendant CHRIS SAWTELLE ("Sawtelle") is a 36-year-old Los Angeles media agent and the current CEO of CrossCheck Studios, LLC, who joined the company, seven months after its founding, on September 22, 2021, saying: "I'm grateful to Josh and Michael [Gruen] for giving me this opportunity." After his spiteful company coup, Sawtelle has all but assumed Gruen's identity, now even representing himself as "the visionary co-founder & CEO of CrossCheck Studios."

24.    Defendant JOSH RICHARDS ("Richards") is a Los Angeles actor, producer, social media superstar, and co-founder of CrossCheck Studios, LLC. Richards is also the sole-owner of Buddy's Hard, LLC, into which the profits from his social media engagements and brand deals flow.

25.    Defendant CROSSCHECK STUDIOS, LLC ("CrossCheck") is a Los Angeles production company co-founded on February 17, 2021, by Gruen and Richards boasting strategic partnerships with Unrealistic Ideas and Influential, and studio production deals with STX and Amazon, among others. All pled actions of Richards and Sawtelle were in their capacity as members, officers or agents of, and

---

[9] Dan Whateley, "*The 24 power players using TikTok to transform the music industry, from marketers and record execs to artists,*" BUSINESS INSIDER (AUG. 12, 2020), https://www.businessinsider.com/top-power-players-using-tiktok-to-transform-the-music-industry-2020-8.

are attributable by reference to, Defendant CrossCheck. Except for a 4-5 week period of medical leave, Gruen worked 80+ hours per week for Defendant CrossCheck and Defendant Buddy's Hard from February 17, 2021, until his medical leave on February 2, 2022, for which he received no pay whatsoever and only suffered losses.

26.     Defendant BUDDY'S HARD, LLC ("Buddy's Hard") is a Delaware Limited Liability Company registered with the State of California, with a principal place of business in Los Angeles County. Buddy's Hard is the primary business of Defendant Richards, who is its sole member.

## NATURE OF THE ACTION

27.     Gruen brings this action to rescind the settlement agreement seeking restitutionary and special damages. In the alternative, he demands damages for multiple breaches of the agreement. Separately, he also brings this action to recover his unpaid wages for his work at CrossCheck Studios and Buddy's Hard.

## FACTUAL ALLEGATIONS

28.     Plaintiff incorporates by reference the Introduction to this Complaint.

*Michael Gruen Works His Heart Out for CrossCheck Studios*

29.     On February 17, 2021, following their Sway House collaboration, acclaimed 22-year-old entrepreneur and businessman Michael Gruen and 19-year-old social media star Josh Richards founded CrossCheck Studios, LLC,[10] a production company based out of their common domicile, as a launchpad for Richards's film

---

[10] William D. Cohan, *'"I Have Lightning in a Bottle Right Now": TikTok Star Josh Richards Wants to Get Gen Z Rich Quick,'* VANITY FAIR (Mar. 31, 2021), https://www.vanityfair.com/news/2021/03/tiktok-star-josh-richards-wants-to-get-gen-z-rich-quick

industry ambitions.[11] At formation, Richards held a 50.01% stake, Gruen 49.99% because Gruen insisted that Richards hold the controlling stake in the business. Gruen's share was later reduced to 38.742% to add executive staff.

30.     On February 17, 2021, David Bolno and NKSFB were assigned by CEO Richards to be business managers for CrossCheck Studios. Bolno was Richards's existing business manager since November 11, 2020, on referral of his then-entertainment lawyer.

31.     On or around February 17, 2021, CEO Richards moved all existing staff from Buddy's Hard onto the CrossCheck Studios payroll.

32.     On February 23, 2021, Plaintiff secured a partnership between CrossCheck and Unrealistic Ideas, a production company led by Mark Wahlberg, Steven Levinson and Archie Gips with a view toward making CrossCheck the "go to company for internet native creatives" seeking studio-level production.[12]

33.     On March 25, 2021, Gruen recruited a Director of Development to prepare for ongoing talks with Paramount+, Peacock, Snapchat, Facebook and YouTube for CrossCheck's production services.[13] CEO Richards signed this

---

[11] Plaintiff requests this court take judicial notice of social media posts and articles in the footnotes of this complaint. *See, e.g., Farah v. Esquire Magazine*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012) *aff'd*, 736 F.3d 528, 534 (D.C. Cir. 2013) (taking judicial notice of "various internet postings" to establish context for dispute).

[12] Chris Gardner, "*Social Media Star Josh Richards Partners With Mark Wahlberg's Unrealistic Ideas to Form CrossCheck Studios,*" HOLLYWOOD REPORTER (Feb. 23, 2021), https://www.hollywoodreporter.com/tv/tv-news/social-media-star-josh-richards-partners-with-mark-wahlbergs-unrealistic-ideas-to-form-crosscheck-studios-4136645/

[13] Geoff Weiss, *"Josh Richards' CrossCheck Studios Names Brianna Solo Director Of Development,"* TUBEFILTER (Mar. 25, 2021), https://www.tubefilter.com/2021/03/25/josh-richards-crosscheck-studios-hires-brianna-solo-development/

employee's contract.

34.　On April 21, 2021, Gruen recruited CrossCheck's videographer, photographer and film editor. CEO Richards signed this employee's contract.

35.　On April 22, 2021, Gruen recruited an experienced NBA agent to serve as the managing partner of CrossCheck Sports. CEO Richards signed this contract.

36.　In late July, 2021, Gruen initiated and closed a deal to acquire the book rights to the story of the man who killed Osama Bin Laden.

37.　In August, 2021, Gruen worked on efforts to package and be first to market for a documentary on Gabby Petito and even got some witnesses to sign on. However, the effort fell through in October when Sawtelle slow-walked the project.

38.　In August, 2021, Gruen led CrossCheck's efforts in bids against CAA for the rights to Totally Spies, an animated series, before handing it off to staff.

39.　On September 9, 2021, Gruen began discussions with Mike Hopkins who runs Amazon Studios about what would result in a $5 million+ production deal.

40.　On September 16, 2021, Gruen secured a strategic partnership with Influential, an agency with over 3 million influencers on platform, for CrossCheck to exclusively provide their studio-level content needs for Fortune 500 campaigns.[14]

41.　On September 22, 2021, Sawtelle left ICM to join "CrossCheck Holdings" as Co-President saying, "I'm grateful to Josh and Michael for giving me this opportunity…" (emphasis added).[15] CEO Richards signed Sawtelle's contract.

42.　On October 1, 2021, Gruen and Sawtelle recruited ex-Paramount

---

[14] Erika Wheless, *"2021 Ad Age 40 Under 40: Ryan Detert," AD* AGE (Oct. 4, 2021), adage.com/reprint-AA1487Detert

[15] Dade Hayes, "*ICM Agent Chris Sawtelle… [Joins] CrossCheck Holdings*," DEADLINE (Sept. 22, 2021), https://deadline.com/2021/09/icm-agent-chris-sawtelle-crosscheck-holdings-josh-richards-1234842226/

executive Jared Sleisenger who had previously contributed to the development of series on Showtime, Hulu, Netflix, and AppleTV as CrossCheck's Head of Television.[16] CEO Richards signed Sleisenger's contract.

43.     In October 2021, Gruen initiated talks for CrossCheck to co-produce the Nickelodeon movie for Danny Phantom, a deal that was set to go until Sawtelle's team dropped the ball after Gruen's departure.

44.     On October 11, 2021, CrossCheck received a non-binding offer from Candle Media CEO/Founder Kevin Mayer, Gruen's mentor and former TikTok CEO, for the purchase of all equity in CrossCheck Studios for $25 million. Ex. D. Two years later, December 17, 2023, a CrossCheck executive lamented, "[w]e should have made that CrossCheck-Candle deal when we had the chance."

45.     On October 26, 2021, Gruen initiated efforts for CrossCheck to acquire the rights to Runescape, handing the close-off to Jared Sleisinger and Sawtelle.

46.     November 3, 2021, Gruen initiated and secured a groundbreaking First-Look film deal with STXfilms which provided for CrossCheck to produce its first movie and for Richards to headline in it, making Richards the youngest studio backed producer in Hollywood despite having no experience.[17]

47.     On November 7, 2021, Gruen underwent bariatric surgery and returned to work on his computer and phone the same day, and throughout his six days under medical care, despite being in tears at times due to post-surgical pain.

---

[16] Dade Hayes, *"Ex-Paramount Exec Jared Sleisenger Joins CrossCheck Studios As Head Of Television,"* DEADLINE (Oct. 1, 2021), https://deadline.com/2021/10/paramount-television-jared-sleisenger-crosscheck-studios-head-of-television-1234848225/

[17] Anthony D'Alessandro, "*Social Media Star [] Lands First Look-Deal With STX...,*" DEADLINE (Nov. 3, 2021), https://deadline.com/2021/11/josh-richards-stxfilms-first-look-deal-halloween-party-1234867557/

48.     On November 24, 2021, Gruen began efforts for Richards to co-star in DreamWorks animated series Fright Krewe. Gruen would learn that Richards received the part in late March 2022, after Gruen's firing, and quickly let him know.

49.     In December 2021, Gruen arranged for CrossCheck to co-produce alongside former Paramount head Adam Goodman, and for Richards to co-star in a movie "Ok, Boomer," which was ultimately picked up by Paramount. Goodman would pull out of the arrangement saying he "only wants to work with Gruen."

50.     In January 2022, Gruen worked on placing a notable co-star for the movie "Ok, Boomer," pitching Dave Beckey for Kevin Hart, connecting with Ashton Kutcher several times, and connecting with Nicky Weinstock about co-producing.

51.     Other projects that Gruen was working on before his medical leave and firing include but are not limited to a Larry King biopic and possible documentary series, efforts to try to secure rights for a Robin Williams biopic, early talks for an Entourage Reboot co-produced with Aaron Korsh, and early talks with Rob Lowe for a Brat Pack (moniker for big-name 1980s teen actors/actresses) documentary.

### *Gruen Works His Heart Out for Buddy's Hard*

52.     Buddy's Hard is Josh Richards's wholly owned company through which Richards' profits for social media engagements and brand deals went. Gruen's work conferred over $5 million benefit on Buddy's Hard, but Gruen was never paid.

53.     On June 30, 2021, Gruen helped arrange for Richards to become an advisor to the NHL with a view toward additional deals.

54.     From June 2021 - October 2021, Gruen helped initiate and secure Richards a book deal with Simon & Schuster that was handed off to and fumbled by Richards's then-agent Sawtelle – Gruen would then take it over managing to get the deal signed, but that deal would go nowhere because Sawtelle proceeded to fumble it again.

55.     On August 1, 2021, Gruen recruited a brand partnerships and business development manager, whom Richards then placed on CrossCheck's books despite this employee's work solely being on deals that benefitted Buddy's Hard.

56.     On August 26, 2021, Gruen helped arrange for Richards to Mentor Up-And-Coming Creators for Logitech Talent Search.

57.     On August 31, 2021, Josh Richards rang the bell at the Canadian stock exchange on behalf of WonderFi, a publicly traded DeFi startup by Shark Tank's Kevin O'Leary (aka Mr. Wonderful).

58.     On September 15, 2021, Gruen arranged for Richards and Sway alum Griffin Johnson to partner with Playco (Instant Gaming) for a first ever TikTok game.

59.     On October 12, 2021, Gruen helped arrange for another Richards collaboration with Logitech to announce Illustrator "its HunniB" as Creator Incubator winner.

60.     On December 4, 2021, Gruen helped arrange for Richards to be the "face of" MCM's winter campaign for their 45th anniversary.

61.     From February 17, 2021 to February 2, 2022, Gruen helped initiate, secure, or assist in fulfilling Richards's deals with Barstool's BFFs Podcast, Amazon AMP, Invisalign, Tinder, Cash App, Grubhub, LinkTree, SeatGeek, FanJolt and Patreon.

62.     Around November 2, 2022, Sawtelle wanted Richards to leave Barstool after Business Insider's controversial article about that company's co-founder and BFF's podcast co-host Dave Portnoy. Gruen believed that the stories were false and advised Richards to stay. The podcast remains a major revenue source for Buddy's Hard.

63.     With respect to each of the businesses, Gruen connected Richards with: Dr. Shaquille O'Neal, Ed.D, A-Rod, Rich Kleiman, Ashton Kutcher, Mark Wahlberg,

Kevin Mayer, Thomas Tull, Rob Lowe, Whitney Cummings, Sean Rad, Michael Ireland, Scooter Braun, Jeffrey Katzenberg, Dana Walden, Gary Varnerchuk, Brian Robbins, Jon Fletheimer, Stacy O'Neil, Vin Diesel, Erik Feig, Manager Myles, Peter Cramer, Donna Langley, Jef Ross, Rob Liefield, Lorenzo DiBonaventura, Evan Spiegel, Marc Roberts, the Winklevoss Twins, Anthony Scaramucci, and dozens more.

*CrossCheck and Buddy's Hard Pay Gruen Less Than $0 For His Labor*

64.     On December 23, 2021, Gruen requested a distribution of $15,000 from NKSFB, CrossCheck's then-business managers. This was the only payment that Gruen would receive from CrossCheck, and it was based on his rights as equity holder. For context, other executives received salaries.

65.     On April 14, 2022, Sawtelle's handpicked business manager, who still moonlights as Sawtelle's personal tax preparer, confirmed a tax liability was assigned to Gruen for his proportionate share of CrossCheck's profits despite Gruen being unpaid. The resulting tax cost was estimated at about $30,000.[18]

66.     Throughout Gruen's unpaid employment with CrossCheck and Buddy's Hard, Richards would have Gruen cover Richards's Tesla lease, car insurance costs, phone bills, and various other professional costs well-exceeding the $15,000.

67.     Throughout Gruen's unpaid employment with CrossCheck and Buddy's hard, Richards would have Gruen cover various expenses for travel and for dinners with media executives, some of these arrangements costing several thousand dollars-a-pop, and cumulatively well-exceeding the $15,000 distribution Gruen obtained.

68.     After Gruen's termination, Richards even ordered a massage on Zeel

---

[18] Undersigned has not yet had an opportunity to have an accountant confirm the precise dollar amount of resulting tax liability that resulted.

using Gruen's debit card, presumably by accident.

69. Gruen received less than $0 for his work at CrossCheck and Buddy's Hard.

### *Gruen is Fired While on Medical Leave*

70. On February 2, 2022, Gruen went on medical leave at the behest of his father and upon order of his doctor after showing symptoms of neurological impairment, vertigo, extreme fatigue, being unable to eat more than a bite of food, falling down stairs, and generally showing a drastic deterioration of his health.

71. On February 3, 2022, Gruen collapsed on the streets of New York, suffered confusion and temporarily lost almost all feeling in his legs before being rushed to the emergency room by his father.

72. That day, after running a battery of tests, Gruen's doctors determined that he was suffering from a severe thiamine deficiency, a condition also known as Beriberi, which causes symptoms including speech and ambulation difficulties, mental confusion, and loss of feeling to the extremities with a 3-6 month recovery period for the abatement of brain and nervous system effects.

73. From February 3, 2022 until his firing, Gruen made all reasonable efforts to remain responsive, while doing his best to recover, aided by his father consistently making him his favorite matzah ball soup, but despite his best efforts Gruen would have been unable to perform full work duties while ill.

74. On or around March 7, 2022, Gruen was informed by a member of the Unrealistic Ideas team that a coup was underway at CrossCheck and that he should get back as soon as he could.

75. On March 7, 2022, Gruen not-yet medically recovered called Richards to say that he was flying out to return to work at which point Richards told him he should not return as he was being replaced effective immediately by Sawtelle.

Richards indicated that Gruen could still do (unpaid) work at CrossCheck Sports.

76. On March 10, 2022, Richards wrote to Gruen, referencing the firing saying, "Hey do you wanna call soon and discuss how to structure and moving forward?"

77. During a call that followed the message, Richards suggested to Gruen that the company could do a buyout of his equity.

78. In the days following, Jared Sleisinger (then-CrossCheck's Head of TV) reached out to the principals on all ongoing projects to let them know that Gruen would no longer be with the company/[ies].

79. On April 3, 2022, Gruen posted a tweet complimentary of Richards and noting that they were no longer working together. This was later framed as a resignation, but Gruen had already been fired — he posted it so there was clear notice that he could not field business or prospective deals for Richards.

80. In the days that followed, Gruen reached out to Richards and Sawtelle to discuss a buyout of his CrossCheck Studios equity, but these communications went entirely ignored.

81. On April 12, 2022, Gruen attempted to initiate discussions on a buyout, to receive his K-1, and to request an accounting and inspection of records. Gruen was directed to the Business Manager (who is still Sawtelle's personal tax preparer).

82. In his various responses over several weeks, the Business Manager wrote emails with Richards, investors, and the Litigation Counsel on "cc" claiming Gruen "unilaterally siphoned" money, was "lin[ing] his pockets," was trying to walk away with investor money, was not at work for six months due to "fat-loss surgery," was "greedy," was "incompetent," was "taking advantage of Mr. Richards," among other claims. The Business Manager, in a separate communication with CrossCheck Sports executive Zachary Charles claimed that Gruen "screwed" him out of money. The

Business Manager also openly derided Gruen's then-attorney as an "incompetent attorney" and repeatedly referred to him as a "ham-and-egger lawyer." Further, the Business Manager told Gruen that if he contacted Richards or anyone at the company about the businesses he still held equity in, to request an accounting and inspection of records, or with any other inquiry, it would be treated as "harassment" that is "punishable by up to 6 months in jail and a fine up to $1,000." This also had the effect of barring Gruen from picking up his belongings from the house, among other issues.

83.     On April 14, 2022, an attorney identifying themselves as "litigation counsel to Mr. Joshua Richards" issued a letter claiming Gruen "abus[ed] his role" putting Richards into "self-serving deals" and "lopsided contracts" to "take advantage" of and "exploit" Richards. The Litigation Counsel falsely claimed that Amazon had ended negotiations with CrossCheck: "**Amazon is not engaging with CrossCheck** because Amazon indicated that they are only seeking **Mr. Richards' services** and want to work with him directly." The letter also claimed Gruen owed Richards $142,500 in back rent, something never previously claimed by Richards.

84.     On April 30, Gruen's then-attorney informed Litigation Counsel that Gruen would be in Los Angeles and wanted to pick up his belongings from the house.

85.     On May 1, 2022, Litigation Counsel responded "[u]nder no circumstances is Mr. Gruen to personally visit [the house]."

86.     On May 2, 2022, having been banned from his home without notice and with his belongings held hostage, Gruen through then-counsel again requested that he be allowed to pick up his chattels. The Litigation Counsel again responded "Gruen will not be allowed on the property," but that he could pay for a third-party company to pick up his belongings. At the time, Gruen would have needed to, while suffering from brain and neurological illness, organize both third-party movers and CrossCheck staff, while still under threat that if he contacted anyone there he would be arrested

for "harassment."

87.   On June 9, 2022, fast forward to the settlement, Gruen still was not able to pick up his belongings with Litigation Counsel saying in an email that Gruen "can arrange with [the Business Manager] once we sign [the settlement]." This was the same business manager that had told investors that Gruen was walking with their money, told Richards that Gruen was siphoning money, mocked Gruen for "fat-loss surgery," unilaterally revoked his equity in a company and disposed of its assets, and several times threatened to have Gruen arrested for harassment for sending emails asking about a company he had equity in. CrossCheck deliberately and improperly created impediments to Gruen accessing his valuable belongings.

## *Settlement*

88.   Litigation Counsel made two material false or deceptive representations with substantial implications for assessing the value of Gruen's equity in CrossCheck: (a) at the outset, that Amazon refused to do the production deal with CrossCheck but were still doing a deal (for social media deliverables) with Richards; and (b) over 40 days later, and in response to the request for an accounting and inspection of records, that the account balance substantially dipped following Q1 2022.[19]

89.   Buddy's Hard had been systematically dumping its losses into CrossCheck, which skewed the amounts in CrossCheck's accounts impairing its valuation. Out of the same home and business location as CrossCheck, Richards' primary business was his wholly owned LLC, Buddy's Hard, where profits from his brand deals and social media engagements were routed and which Gruen neither had a stake in nor received a commission from. This is notable because upon starting

---

[19] These statements are legally attributable to the Litigation Counsel's client, "Joshua Richards," on the presumption that an attorney would not violate Rule 4.1, a presumption that opposing parties (here Gruen) regularly rely upon.

CrossCheck Studios, Richards moved staff (and expenses) off of Buddy's Hard books, for which he was solely responsible, and slushed them over to CrossCheck Studios, thus tossing half of his liabilities onto Gruen. Further, all staff hired at CrossCheck thereafter (except one) worked primarily on projects the profits for which flowed into Buddy's Hard. Richards also signed each employee contract. Due to Buddy's Hard costs being pumped onto CrossCheck's books, account statements alone would not accurately reflect CrossCheck's value.

90.     Sawtelle was also, on information and belief, running side talent and brand deal business off-the-books in violation of his employment agreement which dictated that the proceeds therefrom were to go into CrossCheck's account. Gruen requested a list and accounting of these side business clients only days before going on sick leave and he was assured by Sawtelle's assistant Luke Gotzon that the list would be provided. Ultimately, no list was provided. The failure by Sawtelle to route these deals to CrossCheck's accounts impaired the Company's valuation and, further, Gruen's request for this information provided further motive for Sawtelle's malicious actions in forcing him out of the Company.

91.     Proper accounting to assess the true and fair value of the business was never provided, in violation of California Corporations Code section 17704.10, because the Defendants refused to do so.[20] Instead, they pressured Gruen – at the time when he was ill and vulnerable and through misrepresentations, fraud, and harassment – to give up his equity for a fraction of its worth.

---

[20] After 40+ days of requests, Litigation Counsel and the Business Manager eventually provided QuickBooks statements that did not include the period after Q1 2022. On renewed request, a partial print of bank transactions was provided. Finally, Litigation Counsel refused to provide entries from Buddy's Hard despite the comingling of the two businesses. The throttled output was materially deficient under Cal. Corp. Code § 17704.10.

92.     As to the aforementioned Amazon deal, there were **two legs** to the deal that was being negotiated: (a) **CrossCheck studios would agree to sell its unscripted content only to Amazon**, the consideration for which would go solely to CrossCheck; and, separately, (b) **Richards would provide his services by making social media posts,** the consideration for which CrossCheck's members had agreed should go to Richards's wholly owned Buddy's Hard. The Litigation Counsel's representation that Amazon was only seeking Richards's services, could only mean that the first leg of the deal had been cut out, and that Amazon was only going to have Richards do social media posts. This was not true.

93.     Moreover, as to the aforementioned Amazon deal, defendants could not unilaterally encumber the full unscripted rights of a company where Gruen was a 38.742% owner without his permission and without affecting the value of his equity. In short, the whole deal was still on the table for CrossCheck, when the Litigation Counsel falsely claimed in letter that it was not. Had Gruen been afforded the true information about the deal, to which he was entitled, he would not have entered into the settlement.

94.     On June 10, 2022, based on material misrepresentations about the viability of the Amazon deal, about the financial state of the company skewed by Buddy's Hard systematically dumping their expenses into CrossCheck, and, on information and belief, other false or fraudulent depictions of the Company's financial health, Gruen agreed to a settlement with Richards, Sawtelle, [and Sleisinger] forfeiting his 38.742% equity in CrossCheck Studios in return for a payout of $90,000 and a promise of a final dinner with Richards.

95.     On information and belief,[21] CrossCheck Studios had already entered the Agreement with Amazon prior to the settlement agreement's execution on June 13, 2022, in violation of the CrossCheck Studios First Amended Operating Agreement's 85% "Major Decisions" threshold.[22] Ex. E. Prior to the Settlement Agreement, the other members only had 61.258% of the membership interest and thus not only owed Gruen an affirmative duty to disclose that the Amazon deal was still on the table – as opposed to falsely representing that it was not – but they also could not even lawfully enter into the agreement, when they did, without his approval.

96.     Per a former CrossCheck Studios executive, and in direct contravention to the representations made on behalf of the Company by the Litigation Counsel, negotiations between CrossCheck and Amazon never came to a halt ("Stopped as to negotiations? Don't think so") and the deal was never just between Richards and Amazon ("Well even the announcement states the deal was with CrossCheck. It was not a Richards deal, it was both").

*Post-Settlement: Amazon Deal Goes Through, Defendants Breach*

97.     June 23, 2022, only ten days post-settlement, Amazon entered into the production deal with CrossCheck Studios, worth at least $5 million, with Amazon's executive stating, "We look forward to all of the creative ingenuity ahead with both

---

[21] Specifically, the basis for this averment a former CrossCheck executive who stated: "It was def[initely] announced after it commenced. It's not like it signed and next day announced. Took a while to get announcement approved etc. Amazon wanted to wait to find a project to announce it with which became TNF [or Thursday Night Football]." The announcement was only seven days after the settlement agreement was fully executed, and in context, it sounds like the delay between the Amazon agreement's signing and execution exceeded seven days.

[22] This threshold applied to the Amazon agreement because of the encumbrances placed on the Company's legal rights and assets, tangible or intangible.

Josh **and CrossCheck Studios.**"[23]

98.     On June 23, 2022, Sawtelle wrote about the closing of the deal: "It takes a village . . . Josh Richards **and I** are PRIVILEGED to **finally** announce that we have **formalized** our relationship with Amazon and the NFL."[24]

99.     Gruen reached out to the Litigation Counsel to ask about arranging the dinner with Richards per the agreement. The Litigation Counsel acknowledged receipt but failed to ever render any substantive response.

100.    Following the settlement, per a CrossCheck executive, Sawtelle derided the dinner provision, talked about undermining the purpose of the consideration (mentioning he could have Josh just walk in for two minutes), and ultimately blocked Richards from attending the dinner.

101.    Following the settlement Sawtelle obtained and/or used Gruen's full personal business contact list, via Gruen's CrossCheck email. Sawtelle proceeded to use the contact list for his own benefit and to disparage Gruen.

102.    On or around, March 10, 2023, Sawtelle used Gruen's personal contact list to set a meeting for Richards and himself at the residence of billionaire Thomas Tull, Gruen's mentor.

103.    Prior to this meeting on or around March 10, 2023, Sawtelle boasted to other CrossCheck staff that he was going to ruin Gruen's relationship with Tull.

104.    On or around March 10, 2023, at the Tull residence, Sawtelle, in concert

---

[23] J. Clara Chan, *"Josh Richards to Create and Produce TV Shows for Amazon Studios Under First-Look Deal,"* THE HOLLYWOOD REPORTER (June 23, 2022), https://www.hollywoodreporter.com/business/digital/josh-richards-amazon-studios-deal-1235171090/

[24] Chris Sawtelle, "*Posts*," LINKEDIN (June 23, 2022), https://www.linkedin.com/feed/update/urn:li:activity:6945847096876957696/

with or on behalf of Richards, disparaged Gruen referring to him as a fraud and claiming he abused his business relationship with Richards for personal gain. After Sawtelle and Richards visited the residence, Tull would never talk to Gruen again.

105. On information and belief, on or around March 13, 2023, Sawtelle used Gruen's personal contact list to set a New York meeting for Richards and himself with Kevin Durant's manager Rich Kleiman.

106. During that meeting, occurring on or around March 13, 2023, Sawtelle, in concert with or on behalf of Richards, disparaged Gruen in violation of the agreement specifically calling him "bad news" and insinuating that he abused his business relationship with Richards for personal gain before declaring that "there's a new sheriff in town" (referring to himself).

107. After the June 13, 2022 settlement, Sawtelle used Gruen's contact list to try to set a meeting for Richards and himself with former TikTok CEO Kevin Mayer, also a mentor to Gruen.

108. Prior to, and occurring in temporal proximity to, the events of the preceding paragraphs, Sawtelle boasted to CrossCheck staff about his plans to ruin Gruen's relationship with Mayer.

109. Per one CrossCheck executive, Sawtelle tried the same stunt with other Gruen contacts including comedy talent manager and producer Dave Beckey and Roku's Brian Tannenbaum.

110. On December 6, 2023, a CrossCheck executive informed Gruen that Sawtelle was disparaging him using his personal contact list saying, "the ppl he's telling about you are your contacts." Sawtelle, in concert with or on behalf of Richards, disparaged Gruen on numerous occasions to other people in violation of the non-disparagement provision of the settlement.

111. The defendants' disparagement of Gruen, before and after the settlement,

and the backstabbing which began immediately after Gruen became ill, are all the more egregious given that just days before Gruen's medical leave on February 2, 2022, Gruen and the defendants were filmed together in the following video showing how hard he worked: https://youtu.be/GhvXWDyPNvs?si=lpS_pscly-SiePnu. It was when Gruen became ill and was at his most vulnerable that the defendants found an opportune time to deprive him of his fair share in the business, while keeping all the benefits of Gruen's unpaid work to themselves.

## FIRST CAUSE OF ACTION

### Rescission: Fraud

*(Against CrossCheck Defendants)*

112.   Gruen realleges and incorporates by reference paragraphs 1-111.

113.   Defendants Richards, Sawtelle and CrossCheck, and/or their agents or co-conspirators ("CrossCheck Defendants") had knowledge of Gruen's diminished capacity and/or vulnerability due to his medical and mental health conditions.

114.   CrossCheck Defendants openly derided Gruen's attorney as an "incompetent" "ham-and-egger lawyer" incapable of protecting Gruen's interests.

115.   CrossCheck Defendants were required to provide Gruen an unthrottled accounting, full access to records, and disclosure about major decisions because he was an equity holder, but they either refused or willfully failed to do so.

116.   CrossCheck Defendants made knowingly false representations about CrossCheck Studios' ("the Company") financials by failing to disclose or account for Richards dumping business costs from his sole-owned Buddy's Hard, LLC onto the Company's books.

117.   CrossCheck Defendants made knowingly false representations about the Company's financials by failing to disclose or account for Sawtelle's off-the-books revenues that, pursuant to his employment agreement, were due to the Company.

118.   CrossCheck Defendants made knowingly false representations that the Company's $5 million+ deal with Amazon had fallen through – the Company would close the deal with Amazon only 10-days post-settlement.

119.   CrossCheck Defendants intended to induce Gruen's reliance on these materially false representations by making these representations through their business manager and through counsel in the context of settlement negotiations.

120.   Gruen justifiably relied on these materially false representations because pursuant to California Rules of Professional Conduct 4.1, a lawyer shall not knowingly make a false statement of material fact to a counterparty, or fail to disclose a material fact to the counterparty when necessary to avoid assisting a fraudulent act, such that an attorney's representations about the accounts or whether the Amazon deal was still on the table are reasonably presumed to be truthful – they were not. Gruen also suffered a diminished capacity and was generally vulnerable.

121.   As a result of the non-disclosure, concealment, materially false representations, and outright financial misappropriation referred to in paragraphs 112-120, Gruen suffered grievous injury as the value of his 38.742% in equity would have been worth over $38 million but ultimately he was intentionally misled and defrauded into thinking the value was far less ultimately settling for only $90,000.

122.   As of October 11, 2021, CrossCheck Studios had an estimated fair market value of $25 million and conservatively the additional revenues from the $5 million+ Amazon deal would have, on information and belief, a 4x multiplier effect.

123.   As a result of the CrossCheck Defendant's actions, Gruen suffered restitutionary and special damages of $38,742,000,[25] or an amount or remedy to be

---

[25] *See* Cal. Civ. Code § 1692 (allowing restitutionary and consequential damages in rescission); *Runyan v. Pacific Air Industries, Inc.*, 2 Cal. 3d 304 (1970) (same).



determined by the court, plus punitive damages in an amount to be determined by the court.

## SECOND CAUSE OF ACTION

### Rescission: Duress

*(Against CrossCheck Defendants)*

124.    Gruen realleges and incorporates by reference paragraphs 1-123.

125.    CrossCheck Defendants asserted or implied that they would allege in a lawsuit against Gruen that Gruen took advantage of Richards, that he "unilaterally siphoned" money, that he stole from investors, that he walked around the house in his underwear, and that other incidents would be alleged against him, which collectively would destroy his business and professional reputation – all to deprive Gruen of the fair value of his equity.

126.    CrossCheck Defendants asserted or implied, with no basis in law, that Gruen could be sued for $142,500 in back-rent despite Richards having neglected to ask for rent for a year and Gruen not being in privity with Richards for payment of rent (i.e., Richards was a co-tenant, not a landlord).

127.    CrossCheck Defendants threatened to have Gruen arrested if he made any contact at all which would include him asking for an accounting and inspection, asking questions about the business he held equity in, going to his home (he was also told he was banned from the premises), or attempting to pick up his belongings.

128.    CrossCheck Defendants did disparage Gruen to the CrossCheck Sports investors, who were business contacts of Gruen, claiming that he was trying to steal or improperly obtain the investors' money.

129.    CrossCheck Defendants did disparage Gruen to Zachary Charles, a CrossCheck Sports executive and long-time business contact of Gruen's, claiming that Gruen had screwed him [out of money].

130.   CrossCheck Defendants had weeks earlier voided Gruen's equity in CrossCheck Sports and disposed of the entity's assets without consent.

131.   CrossCheck Defendants engaged in wrongful threats, acts, and tactics against Gruen, who they knew was vulnerable due to neurological illness, mental health issues, and being represented by an allegedly incompetent ham-and-egger lawyer, by making a 20-hour exploding offer, after kicking him out of his house, depriving him of his belongings, threatening him with arrest, accusing him of financial misconduct to investors, voiding his equity in a parallel business and implicitly threatening that if this went to litigation they would destroy him reputationally (false accusations of fraud and taking advantage of clients/investors) and economically (the wholly fictitious claim about $142,500 in back-rent).

132.   Due to Gruen's state of vulnerability, CrossCheck Defendants ongoing extreme harassment, and the threat of further escalated harassment and harm by CrossCheck Defendants, Gruen believed that there was no reasonable alternative to make it stop and to salvage some aspect of his personal and professional life and that he essentially had to accept the agreement. Gruen vomited after hearing the offer.

133.   Absent the wrongful acts, wrongful threats, and wrongful tactics of the CrossCheck Defendants, Gruen would not have consented to the Settlement Agreement which deprived him of millions in equity value and the potential to seek recourse for the malicious conduct that he had been subjected to.

134.   As a result of the CrossCheck Defendant's actions, Gruen suffered restitutionary and special damages of $38,742,000, or an amount or remedy to be determined by the court.

## **THIRD CAUSE OF ACTION**

### **Rescission: Undue Influence**

*(Against CrossCheck Defendants)*

135.   Gruen realleges and incorporates by reference paragraphs 1-134.

136.   Gruen was vulnerable due to being 23-years-old with a neurological illness, mental health issues, and being represented by an allegedly incompetent ham-and-egger lawyer, kicked out of his home, deprived of his belongings, threatened with arrest, falsely accused of financial impropriety to investors and business contacts, having his equity in a parallel business voided, and facing threats of reputational (false accusations of fraud and taking advantage of clients/investors) and economical (a wholly fictitious claim of $142,500 in back-rent) harm if he pursued the full value of his equity.

137.   CrossCheck Defendants engaged in the improper acts and tactics giving rise to undue influence via the Company's business manager and attorney, each with apparent authority to undertake the actual and threatened legal and financial acts.

138.   CrossCheck Defendants engaged in inappropriate acts and tactics of harassment, disparagement, threats of police action, deprivation of housing and belongings, denial of an accounting and inspection of records in violation of California Corporations Code section 17704.10, use of coercion or intimidation by implying they would exploit extraneous information in litigation (alleged siphoning of money, wearing underwear in the house, and some vague alleged incident), and by the hurried voiding of Gruen's equity in, and disposal of the assets of, a parallel business.

139.   As a result of CrossCheck Defendant's inappropriate acts and tactics, Gruen received only $90,000 in exchange for over $38 million dollars' worth of equity and the waiver of his rights to seek further legal recourse for being subjected

to CrossCheck Defendants' repeated extreme malicious acts.

140.   As a result of the CrossCheck Defendant's actions, Gruen suffered restitutionary and special damages of $38,742,000, or an amount or remedy to be determined by the court.

## FOURTH CAUSE OF ACTION

### Rescission: Public Policy/Unconscionable

*(Against CrossCheck Defendants)*

141.   Gruen realleges and incorporates by reference paragraphs 1-140.

142.   There was oppression and unequal bargaining power where Gruen suffered neurological illness and a mental health disorder, was represented by a (per the CrossCheck Defendants) incompetent ham-and-egger lawyer; and where CrossCheck Defendants did further ban Gruen from his home, deprive him of his belongings and refuse to provide him an unthrottled accounting and inspection of records, all under threat of Gruen being arrested; and further where CrossCheck Defendants did hurriedly void Gruen's equity in a parallel business, disparage him to investors and contacts; and further where CrossCheck Defendants did intimate a threat of public ridicule through extraneous assertions in litigation.

143.   The consequences of the oppression and unequal bargaining power were a substantively unconscionable outcome whereby Gruen received $90,000 in return for over $38 million dollars worth of equity and waiving his rights to seek legal recourse for being maliciously oppressed or persecuted by CrossCheck Defendants.

144.   Allowing CrossCheck Defendants to secure a windfall by threatening or taking away the home, belongings, property, liberty, reputation and livelihood of a vulnerable party suffering a neurological illness and mental health disorder would be contrary to public policy and interest.

145.   As a result of the CrossCheck Defendant's actions, Gruen suffered

restitutionary and special damages of $38,742,000, or an amount or remedy to be determined by the court.

## **FIFTH CAUSE OF ACTION**

### **Rescission: Failed Consideration**

*(Michael Gruen – Against CrossCheck Defendants)*

146.   Gruen realleges and incorporates by reference paragraphs 1-145.

147.   A final dinner between Gruen and Richards was a material term of the settlement agreement.

148.   The provision required that CrossCheck Defendants make good faith efforts to facilitate the occurrence of the dinner.

149.   Gruen emailed the attorney for CrossCheck Defendants numerous times to request the dinner, but failed to ever receive a substantive response.

150.   Defendant Sawtelle mocked the material term suggesting Richards could undermine the purposes thereof by appearing for two-minutes at a restaurant and calling it dinner and, further, expressly prohibited Richards from attending.

151.   Because CrossCheck Defendants obstructed Plaintiff from receiving a material benefit underlying his assent, and further CrossCheck Defendants accepted the benefit while not just breaching but rather having absolutely no intent to fulfill this material term whatsoever, consideration is said to have failed, in whole or in part, through the fault of the CrossCheck Defendants.

152.   The non-disparagement was a material term of the settlement agreement after Gruen had endured two months of serial harassment, disparagement to his business contacts and investors, and oppression.

153.   CrossCheck Defendants had no intention whatsoever in fulfilling the material term having intentionally sought out Gruen's entire business contact list to systematically disparage him as a fraud, "bad news" and as somebody who took

advantage of Defendant Richards to the entirety of Gruen's "rolodex."

154.   As a result of the CrossCheck Defendant's actions, Gruen suffered restitutionary and special damages of $38,742,000, or an amount or remedy to be determined by the court.

## SIXTH CAUSE OF ACTION

### Breach of Contract

*(Against Defendants Sawtelle and Richards)*

155.   Gruen realleges and incorporates by reference paragraphs 1-154.

156.   Defendants Sawtelle and Richards, and Plaintiff Gruen entered into and memorialized a settlement by execution of a written instrument on June 13, 2021.

157.   Gruen performed his obligations under the settlement agreement by delivering his equity in CrossCheck Studios, LLC.

158.   The settlement agreement included a provision for Richards to attend a dinner with Gruen ("Dinner Provision") towards the ends of reconciliation and goodwill.

159.   Defendants Richards and Sawtelle breached the Dinner Provision by the following acts or omissions:

a.      Defendant Richards failing to make any good-faith efforts to have the negotiated dinner with Gruen.

b.      Defendant Sawtelle obstructing good-faith efforts to have the negotiated dinner with Gruen by prohibiting Defendant Richards.

c.      Defendant Sawtelle openly bragging to staff about depriving Gruen the benefit of the term, remarking Josh could go for 2-minutes.

160.   The settlement contained a non-disparagement ("Non-Disparagement") provision that applied to all parties including Defendants Richards and Sawtelle.

161.   Defendants Richards and Sawtelle breached the Non-Disparagement by

the following acts or omissions:

a. Defendant Sawtelle, in concert with or on behalf of Defendant Richards, disparaged Gruen to his mentor Thomas Tull calling Gruen a fraud and claiming that Gruen abused his business relationship with Defendant Richards for his personal enrichment.

b. Defendant Sawtelle, in concert with or on behalf of Defendant Richards, disparaged Gruen to Kevin Durant's agent and business partner Rich Kleiman referring to Gruen as "bad news" and claiming that Gruen abused his business relationship with Defendant Richards for his personal enrichment.

c. Defendant Sawtelle, in concert with or on behalf of Defendant Richards, made similar disparaging representations to specifically to Kevin Hart's agent Dave Beckey and Roku's Brian Tannenbaum, per a CrossCheck executive, and possibly others on Gruen's business contact per that executive who said -- "the ppl he's [(Chris)] telling about you are your contacts."

162.   As a result of Defendant Sawtelle's actions, in concert with or on behalf of Defendant Richards, of serial disparagement of Gruen to his mentor billionaire Thomas Tull, to Kevin Durant's agent and business partner Rich Kleiman, Brian Tannenbaum, and potentially others specifically picked from Gruen's business contact list, Gruen suffered general and special damages in an amount of $5 million, or an amount to be determined by the court.

## SEVENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good-Faith and Fair Dealing

*(Against CrossCheck Defendants)*

163.   Gruen realleges and incorporates by reference paragraphs 1-162.

164.   As to CrossCheck Defendants generally, Gruen refers to paragraphs 112-123 (Rescission for Fraud) for the proposition that the CrossCheck Defendants acted

with malice and engaged in deception, evasion, concealment, or made outright intentional misstatements of material fact to deny Gruen at the inception of the bargain initially intended by the parties – a fair buyout of his equity.

165.    Defendant Sawtelle, in concert with or on behalf of Defendant Richards, unfairly interfered with Gruen's right to receive the benefits of the contract by:

a.    Failing to take good-faith steps to fulfill the Dinner Provision.

b.    Openly boasting about depriving Gruen of the benefit of the dinner provision by saying Richards could show up for 2 minutes.

c.    Disparaging Gruen as a fraud, "bad news" and as somebody who took advantage of Richards to Thomas Tull (a Gruen mentor), Rich Kleiman, Dave Beckey, Brian Tannenbaum and potentially others from Gruen's contact list which Sawtelle went out of his way to obtain towards this bad faith end.

166.    As a result of the CrossCheck Defendant's malicious acts, deception, evasion, concealment, and/or outright intentional misstatements of material fact, Gruen suffered restitutionary and special damages of $38,742,000, or an amount or remedy to be determined by the court.

167.    As a result of Defendant Sawtelle's actions, in concert with or on behalf of Defendant Richards, of serial disparagement of Gruen to his mentor billionaire Thomas Tull, to Kevin Durant's agent and business partner Rich Kleiman, Dave Beckey, Brian Tannenbaum, and potentially others specifically picked from Gruen's business contact list, Gruen suffered general and special damages in an amount of $5 million, or an amount to be determined by the court.



## EIGHTH CAUSE OF ACTION

**Failure to Pay for All Hours Worked/Minimum Salary**

**Violation of Cal. Labor Code 204, 218.5, 515, 1194, 1194.2, 1197, 1197.1**

*(Against CrossCheck Studios and Buddy's Hard)*

168.  Gruen realleges and incorporates by reference paragraphs 1-111.

169.  At all relevant times, CrossCheck Studios and Buddy's Hard were required to compensate its executive, overtime-exempt employees a monthly salary equivalent to no less than two times the state minimum wage for full-time employment pursuant to California Labor Code sections 204, 515, 1194, 1194.2, 1197, and 1197.1.

170.  California requires employers to pay their employees a minimum wage for all hours worked which is defined as the "time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work whether or not required to do so. *See Frlekin v. Apple, Inc.*, 8 Cal. 5th 1038 (Cal. 2020). Employers must specifically pay at least the minimum wage, her for an executive exempt employee twice the full-time salary, provided the employer has actual or constructive knowledge that the employee was working.

171.  From March 1, 2021 to March 7, 2022, Gruen suffered or was permitted to perform work for Buddy's Hard that was not outside of the entity's usual course of business, the work (and his housing) was at the control of the business, and he did not have an independently established business performing the same nature of work during the relevant time.

172.  From March 1, 2021 to March 7, 2022, Gruen suffered or was permitted to perform work for CrossCheck Studios that was not outside of the entity's usual course of business, the work (and his housing) was at the control of the business, and

he did not have an independently established business performing the same nature of work during the relevant time. Similarly situated members of the business, including Defendant Sawtelle and former executive Sleisinger, were deemed employees receiving salary.

173.   The manner of work performed for Buddy's Hard and for CrossCheck Studios was intellectual, ordinarily office based, executive level work.

174.   CrossCheck Studios and Buddy's Hard failed to compensate Gruen for the hours that he worked, either at the non-exempt minimum wage or the exempt minimum salary, and Gruen is entitled to compensation for all hours worked, or alternatively the minimum full-time salary.

175.   CrossCheck Studios and Buddy's Hard have knowingly and willfully refused to perform their obligations to compensate Gruen for all wages or salary earned and all hours worked, in violation of California law. As a direct result, Gruen has suffered and continues to suffer, substantial losses related to the use and enjoyment of such wages and/or salary.

176.   As a result of Defendant CrossCheck Studios actions, Gruen has suffered statutory damages of about $58,240 in salary plus $58,240 in liquidated damages plus attorneys fees, interest and the cost of suit.

177.   As a result of Defendant Buddy's Hard's actions, Gruen has suffered statutory damages of about $58,240 in salary plus $58,240 in liquidated damages plus attorneys fees, interest and the cost of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, for a cumulative total of THIRTY-EIGHT MILLION NINE HUNDRED SEVENTY FOUR THOUSAND NINE HUNDRED AND SIXTY DOLLARS

($38,974,960) plus any applicable exemplary or punitive damages, attorneys fees, cost of suit, and pre-judgment and post-judgment interest as follows:

1. For restitutionary and special damages in an amount to be proven at trial (Causes of Action 1-5);

2. In the alternative, for general and special damages in an amount to be proven at trial (Causes of Action 6-7);

3. In addition, for statutory and liquidated damages in an amount to be proven at trial (Cause of Action 8);

4. In addition, for actual and compensatory damages in an amount to be proven at trial (Cause of Action 9-10);

5. For exemplary and punitive damages in an amount to be determined at the time of trial (Cause of Action 1);

6. For attorneys' fees and costs as permitted by applicable law;

7. For pre-judgment and post-judgment interest at the maximum legal rate;

8. For such other and/or further relief as the Court may deem just and proper.

DATED: March 4, 2024          ARTHUR WILLIAM LLP


By: /s/  William Moran II
William Moran II
*Attorneys for Plaintiff Michael Gruen*

DATED: March 4, 2024          WAYMAKER LLP


By: _Scott Malzahn_
SCOTT M. MALZAHN
*Attorneys for Plaintiff Michael Gruen*



## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Civil Rule 38-1, Plaintiff Michael Gruen hereby requests a trial by jury as to all issues and claims in this action, which are subject to adjudication by a jury.

DATED:  March 4, 2024          ARTHUR WILLIAM LLP


By:   /s/ William Moran II
      _____
      William Moran II
      *Attorneys for Plaintiff Michael Gruen*


DATED:  March 4, 2024          WAYMAKER LLP


By:   _____
      SCOTT M. MALZAHN
      *Attorneys for Plaintiff Michael Gruen*

EXHIBIT A

Chris:

I want to start by thanking you for your hard work and dedication. While I know you put a lot of time into TalentX, over the last few days I have come to the conclusion that the relationship at present isn't working in the way that we need.  It was not my intention to "ghost" you, we have a lot of exciting developments happening over here, but I did need some time to think and articulate my thoughts.

Regardless of what has happened, this is how I feel. The below does NOT apply to the work being done for TalentX as an entity and its IP. Across the board, we have been happy with how we've been serviced there, and that is an obvious testament to the amazing work you and Kagan are doing on an enterprise level.

Only one of our clients has been given an agent outside of yourself. That client is Alejandro and, per your own words, he was easy because Andrea requested him. While I appreciate the work she has done, and I am happy Alejandro feels taken care of, no other talent feels serviced.

With that said, I am formally informing you, though I think this was made clear from before, Josh is/has left ICM and will be signing with The Gersh Agency effective immediately. I know he is very appreciative of the work you have done for him through this point, but we feel that this is in his best interest in terms of furthering his career. In that vein, I spoke to Griffin and he is going to pass on signing with ICM. I asked him his thoughts (FWIW: without any context or push in any direction) and he didn't feel, at this juncture, that you would be the best fit for him. In full transparency, to clear up your next thought, this had nothing to do with the WME thing. He will likely be going with a different agent at The Gersh Agency.

While you have said you were annoyed Josh is leaving because you "thought [you] already had Josh [signed as a standard client to ICM]," and I do genuinely understand why you would think that, if he was an across the board ICM client why didn't he have a team around him in the areas important to him? Thus far, for all our talent,  their only agent has been you, and we understand you are quite tapped out between all the enterprise TalentX work and your pre-existing clients (of which you have many and have done a great job for). Unfortunately, this has left us and the guys feeling underserved.

In regards to the rest of the roster, I am still happy to set up any calls you would like, but please make sure you will be able to build a team around them, and approach each of them thoughtfully for a signing meeting. This has been a point of frustration to many talents, myself, and others internally. We are all rooting for you, but we have to do what is best for our clients at the end of the day.

You told me a few days ago that you will "just go sign my own TikTokers,", I saw this as a veiled way of threatening TalentX and its competitive edge in the marketplace. I want to make this clear: I will not tolerate myself and my business being threatened by anyone. To that end, we

were quite surprised to hear about ICM's signing of Club House, essentially a direct competitor in the marketplace.

On multiple occasions, you have called me in and said "I am going to just pull the [ICM] deal." Most notably, this occured the evening of May 3, 2020 where I immediately tried to remedy the situation by giving you all incoming emails on clients of your choice (the ones you have asked for multiple times throughout the last 2.5 months) and took the entire internal team off them so you can show them what ICM can do as their formal agent. In that time, two deals were dropped because you didn't want to handle them because of low dollar amounts (despite me warning you that you don't want the incoming because they mostly are awful) and caused significant issues for me internally as I couldn't assign the emails back to the personnel I took them from.

Since May 3rd, nothing has been generated by ICM for the clients formally taken on that wasn't already in the works.

You took credit for Redbull to Josh from what I  can tell from looking at old chains, Senzer had made the intro for you and had already been told they would give us a production budget. While you may have gotten more money from them than would've otherwise (I have no way to know either way), you took credit in its entirety.

You feel the need to criticize everything I do; every decision I make is always wrong in your eyes. While you are good at your job, so am I. I was a millionaire at 16 and negotiated a $78M NBA contract. I don't need your daily criticism on everything I do. I work in the best interest of my talent and that's it. If I want to put Josh with Larry because I think it makes the most sense, I will. Feedback/advice is one thing, but it is often something you won't drop and happens all too often.

You get mad at me for being proactive in trying to pitch/develop a show and tell me "agents aren't producers," but also criticize me when I have a strategy session with a client when I am doing what I am supposed to do. You get annoyed when I tell you information but you also get annoyed when I don't. When I called you and told you that I got off a call with Warners after they added me in unscheduled, you were annoyed I talked to them without you. You make me not want to supply info because it doesn't end up helping in any way and just causes tension.

You have made it clear to me that you think you are superior to Senzer (for example, this was shown via your criticism on the Ralph Lauren call - BTW: you sorta did a victory lap to me when there is no deal on the table and we have no idea if they actually balked or not inside… we also have no idea if we could've gotten more had we let them make the first offer) . Let me make this clear: I don't agree. I think you are both equal. Senzer was an agent for 5+ years under someone I view as a mentor and have firsthand seen him carry projects on his  back.

You often will call a different person when you are seeking a different result/answer. I am tired of hearing feedback from Warren in regards to my work. I am not going to tolerate that anymore. Warren, myself, and the team are 100% aligned.

You need to be respectful of our schedules just as we need to be respectful of yours. We are scheduled days out. I am not sure why you get mad at me for not picking up each phone call during the day and often will get annoyed when I tell you I am on calls. If you need time with me to be set, please schedule it via my office. I don't mind you trying me, but you getting annoyed when I don't pickup isn't fair.

You got annoyed at Community and All In Challenge in an incredibly unfair way and turned into a whole drama fest for no reason. I did Community as a favor for Chase, not because talent wanted it (they didn't, they did it as a favor to me) and the All In Challenge was done so I can get Sway on Michael Rubin and Gary's radar. That's why I went through them directly and not your assistant who would've emailed their standard email. You wanted credit, but don't seem to realize how much of a push I had to do to get the guys to do both and made it sound like you were the only one who flagged it.

You willingly hop on long calls with people and then complain they went on and on and that you are busy. Please don't do that. If you want to hop on a long call, that's on you. Don't use that as a leverage point. It's unfair.

You want credit for the music JV when that has been in the works since we started the company (it was originally a deal with Republic Records that ended up not going through). It is frustrating when you just assume everyone is stealing your ideas when in reality these things have been in the works for months. While you were the one who brought up Tiny Meat Gang, we already were talking to Warner and they asked us (through Larry and Bret) about Josh and used the Lil Dicky analogy. It is unfair that you get annoyed and complain about things without asking for context.

On multiple occasions you have complained about things that we had all agreed on in the genesis of the relationship (i.e., us keeping inbound), but I have felt that you have tried to push for things we didn't agree on. This has caused a weird environment for me. It is quite frustrating.

I still have other things to write but I think this drives the point home pretty well. With Maxwell and Sean now officially onboard, I am going to leave it to them to navigate the ICM relationship. My only desire is that structure is clearly implemented moving forward. I can't operate like this and neither can you. I hope you understand.

All the best,
MG

# EXHIBIT B







EXHIBIT C

## <u>CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT</u>

This Confidential Settlement and Release Agreement ("Agreement") is made, and entered into as of June 9, 2022 ("Effective Date"), by and between Michael Gruen ("Gruen"), on the one hand, and Josh Richards ("Richards"), Chris Sawtelle ("Sawtelle"), and Jared Sleisenger ("Sleisenger"), on the other hand (collectively, the "Parties").

WHEREAS, on February 18, 2021, Gruen and Richards entered into the Operating Agreement of Crosscheck Studios, LLC ("Crosscheck"), a California limited liability company ("Operating Agreement").  Under the Operating Agreement, Gruen held 49.99% membership interest in Crosscheck; Richards held 50.01% membership interest in Crosscheck.

WHEREAS, on October 21, 2021, the Operating Agreement was amended by the First Amendment to Operating Agreement of Crosscheck Studios, LLC ("Amended Operating Agreement").  The Amended Operating Agreement added two members to Crosscheck, Chris Sawtelle and Jared Sleisenger, which changed the ownership of membership interest of the Parties as follows: Gruen holds 38.742% membership interest in Crosscheck; Richards holds 38.758% membership interest in Crosscheck.

WHEREAS, various disputes arose between the Parties concerning their respective rights and obligations relating to Crosscheck.

WHEREAS, without making any admissions of liability and solely to avoid the cost and uncertainty of further litigation, the Parties to this Agreement now desire to fully and finally resolve all disputes of any nature, including without limitation disputes in connection to Crosscheck.

1.1     <u>Non-Admission of Liability.</u> The Parties acknowledge that this Agreement is entered into in compromise of disputed claims and that neither its execution nor the payment of consideration thereunder is or shall be deemed or construed in any way as an admission of wrongdoing or liability, express or implied by any party, and that this Agreement may not be introduced into evidence as an admission of wrongdoing by any person.

1.2     <u>Buy-Out Amount.</u>  Upon Gruen (or his attorney) delivering a signed copy of this Agreement to Richards' attorney Jeremiah Reynolds, and in consideration for the total sum of Ninety Thousand Dollars ($90,000) ("Buy-Out Amount") to be paid by Richards, Gruen irrevocably assigns to Richards all of Gruen's right, title, and interest pursuant to terms of the Assignment and Assumption of Membership Interest of Crosscheck Studios, LLC (<u>Exhibit A</u>), and irrevocably relinquishes all of his right, title, and interest in any affiliated entity including without limitation Crosscheck Sports, LLC. Nothing in this agreement shall be construed as Gruen transferring or relinquishing any equity interest in any entity other than CrossCheck Studios, LLC or CrossCheck Sports, LLC. The Parties acknowledge that their respective interests in Ani Energy and Animal Capital will not be affected by this agreement.

The Buy-Out Amount shall be payable to Michael Gruen within 30 (thirty) days of Gruen's delivery of a signed copy of this Agreement to Jeremiah Reynolds. Gruen will provide payment instructions to Jeremiah Reynolds concurrently with delivering a signed copy of this Agreement.

1

1.3    <u>Dinner.</u>   Upon full execution of this Agreement, Richards and Gruen will in good faith endeavor to have dinner, provided that the good faith failure to have a dinner due to scheduling or other logistical issues shall not be deemed to be a breach of this Agreement.

1.4    <u>Release by Gruen.</u>  Michael Gruen, on behalf of himself and his respective members, shareholders, partners, subsidiaries, affiliates, agents, officers, directors, attorneys, employees, representatives, assignors, insurers, heirs, and assigns, hereby fully and forever releases and discharges Richards, Sawtelle, Sleisenger, and Crosscheck and its respective members, shareholders, partners, subsidiaries, affiliates, agents, officers, directors, attorneys, employees, representatives, assignors, insurers, heirs, assigns (collectively, the "Richards Released Parties"), from any and all charges, complaints, claims, causes of action, liabilities of any kind, rights, obligations, accountings, or damages, whether known or unknown, suspected or unsuspected, and whether or not concealed or hidden of any nature ("Richards Released Claims").  Notwithstanding the foregoing, nothing in this release shall release obligations under the Agreement or prevent the Parties from enforcing any term of this Agreement.

<u>Release by the Richards Parties.</u>  Richards, Sawtelle, and Sleisgenger on behalf of themselves, Crosscheck, and their respective members, shareholders, partners, subsidiaries, affiliates, agents, officers, directors, attorneys, employees, representatives, assignors, insurers, heirs, and assigns, hereby fully and forever releases and discharges Gruen and his respective members, shareholders, partners, subsidiaries, affiliates, agents, officers, directors, attorneys, employees, representatives, assignors, insurers, heirs, assigns (collectively, the "Gruen Released Parties"), from any and all charges, complaints, claims, causes of action, liabilities of any kind, rights, obligations, accountings, or damages, whether known or unknown, suspected or unsuspected, and whether or not concealed or hidden of any nature ("Gruen Released Claims"). Notwithstanding the foregoing, nothing in this release shall release obligations under the Agreement or prevent the Parties from enforcing any term of this Agreement.

Notwithstanding the foregoing, nothing in this release shall release obligations under this Agreement or prevent any party from enforcing any term of this Agreement. Further, nothing in this agreement shall be construed as altering Paragraph 16 of the original Operating Agreement for CrossCheck Studios, LLC, which requires indemnification of Members. The parties acknowledge that Gruen, as a former member of CrossCheck Studios, LLC, would continue be covered by this section of the original Operating Agreement.

1.5    <u>Waiver and Relinquishment of California Civil Code section 1542.</u>  The parties intend to release each other from all claims known and unknown. The Parties acknowledge that they have read and are aware of the provisions of Section 1542 of the California Civil Code, that their attorneys have fully explained the effect of their waiver of the rights and benefits of section 1542, and that they understand said provisions and expressly waive and relinquish all rights and benefits they have or may have under this section, which reads as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

2

Except as otherwise specifically set forth in this Agreement, the Parties waive any and all rights they have or may have under Section 1542, and/or any equivalent provision of law or successor statute to it, with respect to the Gruen Released Claims and Richards Released Claims (collectively, the "Released Claims"). In connection with this waiver, the Parties acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to Released Claims. The Parties acknowledge that the releases set forth in this Agreement shall be and shall remain in effect as full and complete releases notwithstanding the discovery or existence of any such additional or different claims or facts relevant hereto.

1.6     <u>Representations and Warranties.</u>  Each Party hereby represents and warrants that: (i) it is the sole rightful owner of and has not encumbered, assigned, or transferred, nor will it in the future attempt to encumber, assign, or transfer, any claim or cause of action released herein; (ii) it has not filed with any governmental agency or court any type of action or report against the other Party, and currently knows of no existing act or omission by the other Party that may constitute a claim or liability excluded from the claims released herein; and (iii) it has full authority to enter into, deliver, and perform under this Agreement, and that all acts and actions have been taken to grant such authority, and that no third-party consent, which has not already been obtained, is required.

1.7     <u>Covenant Not to Sue.</u>  In consideration for the promises set forth herein, the Parties covenant, on behalf of themselves and their heirs, successors and assigns, to the fullest extent permitted by governing law, that following the execution of the Agreement, they will not file, participate in, or instigate the filing of any lawsuits, complaints, or charges in any state or federal court or any proceedings before any local, state, or federal agency, except under legal compulsion, asserting any of the Released Claims. This covenant shall not be deemed to apply or construed to apply to any administrative proceeding or government enforcement action the future participation in which is not waivable by an individual as a matter of governing law.

1.8     <u>Confidentiality.</u>  The Parties and their attorneys agree that they will keep this Agreement confidential and any of the negotiations preceding or following it, as to any third party, except: (a) with the prior written consent of the other party; (b) pursuant to an order of court or other governmental body having jurisdiction to issue such order, in which event the party subject to the order shall notify the other party immediately upon receipt of such an order and prior to any such disclosure; (c) to the Parties' tax advisors, accountants, auditors, prospective purchasers, investors, prospective investors, insurers, or reinsurers; or (d) as may be necessary for any Party to establish or enforce rights under this Agreement. If asked about settlement of this Agreement by any others, the Parties or their counsel may state that the Parties have "amicably resolved all differences," provided, however, that in so doing, the Parties shall not disclose the fact or amount of any payments made or to be made hereunder and shall not disclose any other terms of this Agreement. The Parties further agree that they will not make any statements in reference to this Agreement or any legal claims between the Parties, real or imagined, on any public forum, even if such statements do not mention any Party or business entity by name. The Parties acknowledge that this confidentiality provision is a material term of this Agreement and that the non-breaching party will be entitled to actual and provable damages for any breach of it.

3

1.9    <u>Mutual Non-Disparagement.</u>  The Parties agree not to make disparaging remarks about the other in any forum, including but not limited to social media.  The Parties agree that they will no longer claim present affiliation with each other. The Parties may make truthful, non-disparaging statements about their current and past individual company ownership, as well as professional and work histories, though the parties must adhere to the specific confidentiality requirements in Section 1.8 regarding this agreement and the underlying dispute.  For purposes of this Agreement, "disparaging" means having a reasonable possibility of causing damage to reputation.

2.0    <u>Governing Law.</u>  This Agreement is made in, and shall be governed by, construed and enforced in accordance with the laws of the State of California, without regard to any choice of law principles.

2.1    <u>Benefit and Burden.</u>  This Agreement shall be binding upon and inure to the benefit of the Parties, as well as their respective heirs, representatives, successors and assigns.

2.2    <u>Waiver and Amendment.</u>  No breach of any provision hereof can be waived except by a writing executed by all of the Parties to this Agreement. Waiver of any breach shall not be deemed to be a waiver of any other breach of the same or any other provisions hereof. This Agreement may not be modified, amended, supplemented or terminated except by a written agreement executed by the Parties in interest at the time of amendment.

2.3    <u>Construction and Headings.</u> This Agreement has been prepared based on the joint efforts of the Parties. This Agreement is to be construed simply and fairly and not strictly for or against any of the Parties. The paragraph headings contained in this Agreement are for convenience only and shall not be considered for any purpose in construing this Agreement. No provision in this Agreement is to be interpreted for or against either Party because that Party or its legal representative drafted such provision.

2.4    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter of this Agreement, and it supersedes and replaces all prior discussions, offers, negotiations, proposed agreements and agreements related to the subject matter of this Agreement. Each of the Parties acknowledges that no other party, nor any agent, representative or attorney of any other party, has made any promise, agreement, covenant, representation or warranty whatsoever, express or implied, concerning the subject matter of this Agreement that is not contained in this Agreement.

2.5    <u>Independent Advice of Counsel.</u> Each of the Parties represents and declares that in executing this Agreement he/she/it has relied solely upon its own judgment, belief and knowledge, and the advice and recommendations of its own independently selected counsel, concerning the nature, extent and duration of its rights and claims, or had the opportunity to consult their own independently selected counsel. The Parties acknowledge that they have executed this Agreement without fraud, duress or undue influence.

2.6    <u>Severability.</u>  Should any provision in this Agreement conflict with governing law, the Parties agree that such provision is severable from the remainder, such that the remainder shall remain binding and enforceable to the full extent permitted by law.

2.7     <u>Counterparts and Faxed/Scanned/Emailed Signatures.</u> This Agreement may be executed in counterparts, each of which shall deemed an original and all of which shall constitute together one and the same instrument. Facsimile or scanned email signatures may be used and shall be deemed original signatures.


IN WITNESS WHEREOF, each of the Parties do hereby execute this Agreement by affixing their respective signatures thereto.


Michael Gruen


Sign: _____

        Michael Gruen

Date: _____


Josh Richards

Sign: *Josh Richards*
        Josh Richards (Jun 13, 2022 14:19 PDT)
        Josh Richards

Date: Jun 13, 2022


Chris Sawtelle

Sign: *CS*
        Chris Sawtelle (Jun 13, 2022 14:23 PDT)
        Chris Sawtelle

Date: Jun 13, 2022


Jared Sleisenger

Sign: *Jared Sleisenger*
        Jared Sleisenger (Jun 13, 2022 18:16 EDT)
        Jared Sleisenger

Date: Jun 13, 2022

#2800895v3

6

**SSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST**
**OF**
**CROSSCHECK STUDIOS, LLC**

**THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST** ("Assignment") is made as of June 9, 2022 ("Effective Date"), by and between Michael Gruen ("Assignor"), and Josh Richards ("Assignee").

**RECITALS:**

A.      Assignor owns 38.742% Membership Interest in Crosscheck Studios, LLC, a California limited liability company ("Crosscheck").

B.      Assignor desires to assign to Assignee the entirety of Assignor's Membership Interest in Crosscheck in consideration for $90,000 ("Buy-Out Amount"), and Assignee desires to accept from Assignor, the entirety of Membership Interest presently held by Assignor in Crosscheck.

**AGREEMENT:**

In consideration of the foregoing recitals and other good and valuable consideration, the parties agree as follows:

1.      **Assignment**.  Assignor hereby assigns, transfers, delivers and conveys to Assignee all of his Membership Interest in Crosscheck ("Assignor's Membership Interest").  Following the Effective Date of this Assignment, Assignor shall have no further membership interest in Crosscheck and Assignee shall be entitled to exercise all rights and receive all benefits associated with Assignor's Membership Interest.

2.      **Assumption**.  Assignee hereby accepts the foregoing assignment and assumes the liabilities and obligations of Assignor as a Member of the Company in accordance with Assignor's Membership Interest.

3.      **Representations and Warranties**.  Assignor hereby represents and warrants to Assignee that he has not previously assigned, transferred or sold Assignor's Membership Interest, and that there are no liens, claims or encumbrances of any nature burdening Assignor's Membership Interest.

4.      **Further Actions.**  Each of the parties hereby covenants and agrees, as his own expense, to execute and deliver, and cause to be executed and delivered, at the request of the other party, such further instruments of transfer and assignment and to take or cause to be taken such other action as such other party may reasonably request to more effectively consummate the assignment and assumption contemned in this Assignment.

5.      **Counterparts**.  This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

#2801033v1

Assignor and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR:**

Michael Gruen

By: _____
Name: _____
Its: _____

Assignor and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNEE:**

Josh Richards

By: *Josh Richards*
    Josh Richards (Jun 13, 2022 14:19 PDT)
Name: Josh Richards
Its: Self

The other Members hereby consent to this Assignment as of the Effective Date.

**MEMBER:**

Chris Sawtelle

By: _____
    Chris Sawtelle (Jun 13, 2022 14:23 PDT)
Name: Chris Sawtelle
Its: Self

**MEMBER:**

Jared Sleisenger

By: *Jared Sleisenger*
    Jared Sleisenger (Jun 13, 2022 18:16 EDT)
Name: Jared Sleisenger
Its: Self

# Crosscheck Studios LLC | Settlement

**Final Audit Report**          2022-06-13

| | |
|---|---|
| Created: | 2022-06-10 |
| By: | Esteban Di Masi (edm@atorieadvisors.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAGiLZktGr6MslYVPTjPz3PB6H4P73noO6 |

## "Crosscheck Studios LLC | Settlement" History

📄 Document created by Esteban Di Masi (edm@atorieadvisors.com)
2022-06-10 - 0:17:38 AM GMT

✉ Document emailed to Josh Richards (josh@crosscheckstudios.com) for signature
2022-06-10 - 0:19:45 AM GMT

📄 Email viewed by Josh Richards (josh@crosscheckstudios.com)
2022-06-10 - 0:21:58 AM GMT

✍ Document e-signed by Josh Richards (josh@crosscheckstudios.com)
Signature Date: 2022-06-13 - 9:19:55 PM GMT - Time Source: server

✉ Document emailed to Chris Sawtelle (chris@crosscheckstudios.com) for signature
2022-06-13 - 9:19:57 PM GMT

📄 Email viewed by Chris Sawtelle (chris@crosscheckstudios.com)
2022-06-13 - 9:22:17 PM GMT

✍ Document e-signed by Chris Sawtelle (chris@crosscheckstudios.com)
Signature Date: 2022-06-13 - 9:23:21 PM GMT - Time Source: server

✉ Document emailed to Jared Sleisenger (jared@crosscheckstudios.com) for signature
2022-06-13 - 9:23:22 PM GMT

📄 Email viewed by Jared Sleisenger (jared@crosscheckstudios.com)
2022-06-13 - 9:23:24 PM GMT

✍ Document e-signed by Jared Sleisenger (jared@crosscheckstudios.com)
Signature Date: 2022-06-13 - 10:16:49 PM GMT - Time Source: server

✅ Agreement completed.
2022-06-13 - 10:16:49 PM GMT



# EXHIBIT D



# EXHIBIT E

DocuSign Envelope ID: E91D9A21-0D2C-495E-AFE1-2FAD836F5161

# FIRST AMENDMENT
# TO
# OPERATING AGREEMENT
# OF
# CROSSCHECK STUDIOS, LLC

THIS FIRST AMENDMENT TO OPERATING AGREEMENT (this "**Amendment**") is effective as of the close of business on October 25, 2021, and is made with reference to CROSSCHECK STUDIOS, LLC, a California limited liability company (the "**Company**"). This Amendment is being made by all of the Members of the Company.

## RECITALS

A. Ownership of all Membership Interests in the Company is governed by that certain Operating Agreement of the Company made effective as of February 18, 2021 (the "**Operating Agreement**"). Any capitalized terms used in this Amendment which are not otherwise defined shall have the meanings ascribed to them in the Operating Agreement.

B. Pursuant to that certain Services Agreement dated October 25, 2021, Chris Sawtelle ("**Sawtelle**") is acquiring a Membership Interest in the Company (the "**Sawtelle Issued Interest**") in consideration of services to be rendered by Sawtelle or an entity under his control.

C. Pursuant to that certain Services Agreement dated September 30, 2021, Jared Sleisenger ("**Sleisenger**") is acquiring a Membership Interest in the Company (the "**Sleisenger Issued Interest**" and, together with the Sawtelle Issued Interest, the "**Issued Interests**" and each an "**Issued Interest**") in consideration of services to be rendered by Sleisenger.

D. The Members wish to amend the Operating Agreement in order to, among other things, (a) recognize each of Sawtelle and Sleisenger as a member of the Company, (b) provide for certain amendments to the Operating Agreement, and (c) set forth the Company's updated capital structure after the issuance of the Issued Interests.

Accordingly, the Members hereby agree as follows:

1. **CONSENT TO AND APPROVAL OF TRANSFER AND ASSIGNMENT OF THE INTEREST AND OF ADMISSION OF NEW MEMBERS.** By their signatures on this Amendment, the Members hereby consent to and approve of: (i) the issuance of the Issued Interests to, and receipt of the same by, Sawtelle and Sleisenger of the applicable Issued Interest as set forth above in the Recitals hereto, and (ii) the admission of the Sawtelle and Sleisenger as a Member of the Company. Accordingly, effective as of the date hereof, Sawtelle and Sleisenger shall each be deemed a Member, and in such capacity, shall have all of the rights, privileges and powers incident to ownership of the applicable Issued Interest granted and issued to Sawtelle and Sleisenger (including, subject to the vesting rights attached to such Issued Interest, the right to vote the applicable Issued Interest, the right to participate in the management of the Company, the right to access and receive information regarding the Company, and the right to the economic interest relating to such Issued Interest), and shall assume, fulfill and be bound by all of the duties,

responsibilities, liabilities and restrictions incident to ownership of the applicable Issued Interest, whether arising under the Operating Agreement, at law or otherwise.

2.      **AMENDMENT TO SCHEDULE A**.  Schedule A of the Operating Agreement is hereby deleted in its entirety and restated as follows:

| Member | Percentage Interest |
|---|---|
| JOSHUA RICHARDS | 38.758% |
| MICHAEL GRUEN | 38.742% |
| CHRIS SAWTELLE | 20% |
| JARED SLEISENGER | 2.5% |

3.      AMENDMENT TO SECTION 9.   Section 9 of the Operating Agreement is amended and restated as follows:

"The Company will be managed by the Members.  Accordingly, the Company's business and affairs shall be managed by, and all the Company's powers shall be exercised by and under the joint direction and authority of, the Members, acting by majority vote, except with respect to the Major Decisions set forth below, which shall require the consent of eighty-five percent (85%) of the interests of the Members (such percentage being the "Major Decision Threshold".  The Members may delegate some or all of the management of the Company's day-to-day operations to any Person, provided that all such Persons shall be subject to the Members' direction.  No specific grant of authority to the Members in other sections of this Agreement shall limit the power and authority granted to the Members in this Section 9.  No provisions of the Act regarding the presence or absence of a quorum at a meeting of the Members shall affect the determination of whether the proper vote, consent or approval of the Members has been obtained.  Notwithstanding anything else to the contrary in the Act, any matter requiring the Members' vote, consent or approval under this Agreement shall require, as applicable, the Members' majority approval or the Members' Major Decision Threshold approval. Any action required to be taken by the Members may be taken without a meeting, without prior notice and without a tallied vote, if a consent in writing, setting forth the action so taken, shall be signed by the Members required to approve such action in accordance with the terms herein. Prompt notice of any action by written consent of the Members constituting pursuant to this Section 9 shall be given to the Members constituting the percentage interest in the Company needed to consent to the particular decision (i.e. either a simple majority of the Members or an interest constituting the Major Decision Threshold).

For purposes of this Agreement, "Major Decisions" shall mean any of the actions set forth immediately below:

(i)      Amend this Agreement, the Articles or any of the Company's other organizational or governing documents;

(ii)     Admit new Members to the Company, or cause the Company to issue additional membership interests to any third party or to an existing Member;

(iii)     Undertake any act that would cause a change in the Members' percentage interests;

(iv)     Approve any transfer of all or any portion of a Member's interest;

(v)     Set, increase or decrease the compensation payable to a Member, affiliate of a Member, or principal or related party of either;

(vi)     Notwithstanding § 17704.09 of the Act, enter into any business transaction or arrangement with a Member, any entity with which a Member is a principal, or a related party to any of the foregoing Persons, which is not in the ordinary course and conduct of the Company's business;

(vii)     Guarantee, assume, acquire or otherwise become liable for any liability, indebtedness or obligation of any other party;

(viii)     Mortgage, pledge or otherwise encumber any assets of the Company;

(ix)     Sell, lease, exchange, or otherwise dispose of all, or substantially all, of the Company's assets or properties, with or without the goodwill, which is <u>not</u> in the ordinary course and conduct of the Company's business, whether as part of a single transaction or plan or in multiple transactions, except in the orderly liquidation and winding up of the business of Company upon its duly authorized dissolution;

(x)     Cause, permit or approve the merger or consolidation of the Company with another entity;

(xi)     Cause, permit or approve the conversion of the Company into another form of business entity; and

(xii)     Cause, permit or approve the dissolution or liquidation of the Company.

4.     **FULL FORCE AND EFFECT**.  Except as amended by this Amendment, the Operating Agreement shall remain in full force and effect; <u>provided</u>, <u>however</u>, that wherever any term or provision of this Amendment conflicts with any term or provision of the Operating Agreement, the term or provision of this Amendment shall be deemed to supersede the conflicting term or provision of the Operating Agreement.

IN WITNESS WHEREOF, the Members have executed this Amendment as of the date first above written.

JOSHUA RICHARDS

MICHAEL GRUEN

DocuSign Envelope ID: E91D9A21-0D2C-495E-AFE1-2FAD836F5161